## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EILEEN BERTORELLI-ZANGRILLO,<br>c/o Motley Rice LLC<br>28 Bridgeside Boulevard<br>P.O. Box 1792<br>Mt. Pleasant, SC 29465<br><br>Plaintiff,<br><br>vs.<br><br>CARLA J. MARTIN, Individually,<br>4000 Tunlaw Rd NW<br>Apt. 710<br>Washington, DC 20007<br><br>Defendant | ) Case No.:<br>)<br>) COMPLAINT<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### COMPLAINT

Comes now Plaintiff, Eileen Bertorelli-Zangrillo, and brings this *Bivens* action against Defendant, Carla J. Martin.

### JURISDICTION

1.    This is a civil action brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971).   The Court has jurisdiction over this action pursuant to 28 U.S.C.§§ 1331 and 2201 because it is a federal question and pursuant to 28 U.S.C. § 1331 the district courts shall have original jurisdiction of all civil actions arising under the Constitution.

### VENUE

## VENUE

2.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. 1332. A substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

3.    Plaintiff is an individual suing in her individual capacity and Defendant is an individual being sued in her individual capacity, and neither are corporate entities.

4.    Carla J. Martin, at all times relevant herein is a resident of the District of Columbia.

5.    Carla J. Martin, at all times relevant herein was an employee of the United States of America.

## FACTS

6.    From on or about 1989 until on or about 2002, Carla J. Martin was employed by the U.S. Department of Transportation in a position assigned to the Federal Aviation Administration (DOT-FAA), an agency of the United States government.

7.    The DOT is located at 400 7th Street, S.W. Washington, D.C. The FAA is located at 800 Independence Avenue, S.W. Washington, D.C.

8.    From on or about 2002, until the present Carla J. Martin was employed by the U.S. Department of Homeland Security assigned to the Transportation Security Administration (DHS-TSA), an agency of the United States government.

9.    The DHS lists its address on the DHS website at www.dhs.gov/ahspublic/contacts as Washington, D.C. The TSA is located at 601 South 12th Street, Arlington, Virginia.

10.    At all times relevant herein, Carla J. Martin held herself forth as acting under color of her federal authority as an employee and/or agent of the United States government.

11.    At no time relevant herein was Carla J. Martin a U.S. Attorney, an Assistant U.S. Attorney, a federal or state judge, a federal law enforcement officer, a member of Congress, a state legislator, or the President of the United States.

12.    Carla J. Martin is not immune from civil lawsuits.

13.    This cause of action, which is commonly known as a *Bivens* action, seeks to recover damages from Carla J. Martin, individually, for constitutional violations she committed against the Plaintiff, and the damages caused by defendants actions, such action was affirmed in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed. 2d 619(1971).

14.    Plaintiff has no other remedy for the unconstitutional violation of her rights by federal employee Carla J. Martin, and the damages she has suffered due to such acts.

15.    Plaintiff is not an employee of any government agency and thus the cause of action herein does not arise from any federal employment by plaintiff nor are there any other such special factors herein.

16.    The design of the relevant federal programs and/or federal agencies herein -- to wit, the DOT-FAA and the DHS-TSA -- are such that Congress has not provided adequate alternative remedial mechanisms, and it has not explicitly declared any substitute remedy, if any, as a substitute for recovery directly under the Constitution. Any such remedy, if any, is not as equally effective as this *Bivens* action for the constitutional violations herein.

17.    Plaintiff in this action is not claiming an injury resulted from agency action or agency decision, nor is plaintiff claiming herein that defendant violated her Constitutional rights while implementing agency action.

18.    Plaintiff is claiming herein that Carla J. Martin's intentional acts were separate and apart from any agency decision, and violated her Constitutional rights.

19.    Carla J. Martin's acts also were criminal conduct in violation of clearly established law and/or court orders.

20.    Carla J. Martin's actions to conspire or collude to destroy or cover up evidence render plaintiff's judicial remedies inadequate and ineffective and violate plaintiff's right of access to justice.

21.    Carla J. Martin acted contrary to clearly established Constitutional norms that a reasonable official would understand.

22.    On September 11, 2001, plaintiff herein lost a family member on an aircraft operated by United Airlines (UAL) as Flight 93.  Thereafter, and at all times relevant herein, plaintiff brought an individual suit against UAL and others to redress the loss of life and other damages stemming from the death of her uncle on 9/11.

23.    Plaintiff herein is the lawfully appointed personal representative appointed by an appropriate court to seek legal redress and maintain legal action(s) concerning the wrongful death of her uncle.

24.    Plaintiff's underlying claims are embodied in a federal legal action pending in the United States District Court for the Southern District of New York, and captioned:


**EILEEN BERTORELLI-ZANGRILLO,**

**as Personal Representative of the Estate**

of **JOHN TALIGNANI**, Deceased

                       Plaintiffs,              **CASE #02 CV 7259**

vs.

AMERICAN AIRLINES, INC.,

A Delaware Corporation, et al.,

                       Defendants.

    25.    Plaintiff's underlying claim is attached hereto as Exhibit A and incorporated by reference as though fully set forth herein, and as such is described in this Complaint as though it were being independently pursued herein. However, plaintiff's wrongful death action is, and remains, a separate cause of action in another court.

    26.    The underlying cause of action is only an element in this complaint, and it is not identical to, nor sought to be litigated in, this action. The remedies sought by plaintiff herein are different from, and not available in, the underlying litigation.

## CAUSE OF ACTION FOR DAMAGES AND DECLATORY RELIEF

    27.    After commencing the underlying wrongful death cause of action, plaintiff, through her counsel, both through independent investigation and through formal discovery, sought evidence relevant to the case and sought to lawfully prosecute her case and claims in the courts of the United States.

    28.    Evidence both obtained and sought in the underlying case concerns the conduct of airlines of U.S. registry including American Airlines (AA) and United Airlines (UAL) and others, and their performance of aviation security activities.

    29.    These airlines were on 9/11/01, and at all times relevant herein, subject to Federal Aviation Regulations enforced by the DOT-FAA, and after it was established after 9/11/01, subject to regulations of the DHS-TSA.

30. Defendant engaged in the following activities, which actions, and each of them, violated defendant's Constitutional rights by frustrating the underlying wrongful death litigation and harming or depriving plaintiff of her right to a full and/or fair trial:

    a. Carla J. Martin interfered with and deprived plaintiff of evidence in support of her underlying wrongful death case;

    b. Carla J. Martin interfered in the administration and progress of the civil case;

    c. Carla J. Martin destroyed, tampered with, hid, tainted, obfuscated, made unavailable, removed, reshaped or sought to influence evidence in the case and testimony of potential witnesses;

    d. Carla J. Martin colluded and/or conspired with known and unknown representatives of airlines which are defendants in the underlying wrongful death case to hide, obfuscate, make unavailable, remove, abscond with, destroy, change or otherwise tamper with evidence and potential witnesses;

    e. Carla J. Martin deprived plaintiff or caused plaintiff to be deprived of evidence independently obtained by her counsel;

    f. Carla J. Martin sought to prevent plaintiff from engaging in discovery in her underlying civil case;

    g. Carla J. Martin interfered with plaintiff's rights to trial, and to her rights to seek redress in court;

    h. Carla J. Martin illegally tampered with witnesses and evidence in the case of United States vs. Moussaoui which evidence was also sought in plaintiff's underlying wrongful death case and undertook such actions in

an effort to assist the defendants in plaintiff's underlying wrongful death case;

    i.  Carla J. Martin sought and/or enlisted the assistance of others to cause the denial of plaintiff to have access to evidence in her underlying case, including seizing, hiding, removing, sequestrating, labeling as Sensitive Security Information, and otherwise causing the unavailability of information which was previously public;

    j.  Carla J. Martin coordinated, conspired, colluded, aided and abetted or otherwise acted in conduct with certain known and unknown airline representatives, which airlines are defendants in plaintiff's underlying suit, and which representatives are involved in the underlying litigation, all to deprive plaintiff of her Constitutional rights to a fair trial;

    k.  Carla J. Martin violated court orders;

    l.  Carla J. Martin illegally coached witnesses, and otherwise attempted to shade and alter evidence before the <u>Moussaoui</u> court, with the intent of helping defendants in plaintiff's underlying lawsuit in the Southern District of New York; and/or

    m.  Carla J. Martin ordered the destruction of documents and other evidence.

    n.  Carla J. Martin undertook these and/or other such actions which violate plaintiff's Constitutional rights.

31.    Defendant's actions are outside the scope of her official responsibilities as an employee of the United States.

32.    The United States District Court for the Northern District of Virginia determined that Defendant's actions were improper, unauthorized and not capable of

being authorized by her position in the government, and in violation of the Court's orders entered in the case U.S.A. v. Zacarias Moussaoui.

33.    Defendant's acts were for the purpose of assisting persons she has identified in documents as her "friends", including attorneys and/or other representatives acting on behalf of various U.S. airlines, defendants in the plaintiff's underlying lawsuit. Defendant sought to manipulate the evidence and testimony in the Zacarias Moussaoui case to assist her "friends" in defending against this plaintiff's and other plaintiffs', wrongful death suit against the airlines represented by her "friends" and others. Defendant also sought to manipulate the evidence and testimony and damage or destroy plaintiff's right to a fair trial in her underlying litigation in the United States District Court for the Southern District of New York. Defendant did and/or attempted to interfere with, destroy, inhibit, obfuscate, or otherwise make it impossible for plaintiff to obtain evidence and witnesses in her civil action against the carriers including those represented by her "friends" which defendant attempted to assist through her actions.

34.    Plaintiff was harmed by and suffered damages because of defendant's acts and/or omissions.

35.    Plaintiff herein does not otherwise have an adequate remedy at law other than this *Bivens* action. The court in the underlying case, the United States District Court in the Southern District of New York, has already ruled that the defendant's actions at issue in this *Bivens* claim are beyond the scope of its powers, and it is without power or jurisdiction to address the illegal actions of Defendant, Carla J. Martin. The Southern District of New York's order is attached hereto as Exhibit B and incorporated as though fully set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek damages from Defendant, Carla J. Martin, individually, as follows:

a.) damages in an amount deemed by this honorable court to be fair and just,

b.) punitive or exemplary damages as allowed by law,

c.) attorneys fees and costs as allowed by law,

d.) declaratory relief including temporary and permanent injunctive relief commanding defendant Martin to cease and desist her illegal activities; to be barred from actions in regard to 9/11 cases; to be enjoined from further tampering, destruction, obfuscation, removal, hiding or otherwise tainting of evidence or witnesses.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Respectfully Submitted,

Mary Schiavo
DC Bar No. 440175
Motley Rice LLC
28 Bridgeside Blvd.
P.O. Box 1792
Mt. Pleasant, SC 29465
(843) 216-9000

# EXHIBIT A

**HANLY & CONROY LLP**
**Attorneys for Plaintiffs**
**415 Madison Avenue**
**New York, New York 10017**
**(212) 401-7600**
**Jayne Conroy (JC-8611)**
**Paul J. Hanly, Jr. (PH-5486)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EILEEN BERTORELLI-ZANGRILLO,<br>as Personal Representative of the Estate<br>of JOHN TALIGNANI, Deceased, | CASE NUMBER:  02 CV 7259 (AKH) |
| Plaintiffs, | |
| vs. | |
| ARGENBRIGHT SECURITY, INC.,<br>A Georgia Corporation, | |
| SECURICOR PLC,<br>A United Kingdom entity, | |
| UNITED AIR LINES, INC.,<br>A Delaware Corporation, | **SECOND AMENDED**<br>**COMPLAINT** |
| UAL Corporation,<br>An Illinois Corporation, | |
| AMERICAN AIRLINES, INC.,<br>A Delaware Corporation, | Plaintiffs Demand<br>a Jury Trial |
| AMR Corporation,<br>A Delaware Corporation, | |
| CONTINENTAL AIRLINES, INC.,<br>A Delaware Corporation, | |
| AMERICA WEST AIRLINES, INC.,<br>A Delaware Corporation, | |
| AIRTRAN AIRWAYS, INC.,<br>A Delaware Corporation, | |

National Airlines, INC.,                      )
A Delaware Corporation,                        )
                                               )
US AIRWAYS,                                    )
A Virginia Corporation,                        )
                                               )
TEM ENTERPRISES, d/b/a                         )
CASINO EXPRESS,                                )
A Nevada Corporation,                          )
                                               )
THE BOEING COMPANY,                            )
A Delaware Corporation,                        )
                                               )
PORT AUTHORITY OF NEW YORK                     )
AND NEW JERSEY,                                )
A Government entity                            )
                                               )
                            Defendants.        )
_____           )

Plaintiff, Eileen Bertorelli-Zangrillo, as personal representative of the estate of

John Talignani, complaining of the Defendants herein, and upon information and belief,

allege as follows:

## NATURE OF THE CAUSE OF ACTION

1.      This is an action for damages arising from injuries suffered by John

Talignani during the hijacking of United Flight 93 (hereinafter "Flight 93") and for his

death following the aircraft's crash in Shanksville, Pennsylvania on September 11, 2001.

Plaintiffs seek accountability for Defendants' reckless disregard for the safety of the

American public in the hope that airline security systems will be enhanced to such a

degree that future terrorist attacks can be prevented. This is an action for Defendants'

negligent and reckless failure to develop and implement security, safety and design

measures which could have prevented four hijackers from boarding United Flight 93 on

September 11, 2001, with dangerous weapons, terrorizing the passengers and crew,

2

hijacking the aircraft in an apparent suicide mission aimed at Washington, D.C., and ultimately causing the untimely death of John Talignani.

## PARTIES

### PLAINTIFFS

2.     The Plaintiff, Eileen Bertorelli-Zangrillo, is a resident of the State of New York.  Eileen Bertorelli-Zangrillo is the personal representative of the estate of the decedent John Talignani.  Eileen Bertorelli-Zangrillo brings this action on behalf of the estate of John Talignani, and any other heirs of the decedent.

## DEFENDANTS

### Airline Defendants

3.     Defendant United Air Lines, Inc. (hereinafter "United") is a Delaware corporation whose principal place of business is located at 1200 East Algonquin Road, Elk Grove Township, Illinois 60007.  United is a common carrier.  At all times pertinent to the Complaint, United owned, operated and controlled the subject aircraft and was responsible through its officers, employees and agents for the safety and security of United Flight 93.  United was also jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of all aircraft operating out of Terminal A at the Newark International Airport.

4.     Defendant UAL Corporation (hereinafter "UAL") at all times pertinent, was and is a corporation duly organized and existing under the laws of Illinois and maintaining its principal place of business in Chicago, Illinois.

5.     Defendant American Airlines, Inc. (hereinafter "American") is a Delaware corporation whose principal place of business is 4333 Amon Carter Boulevard, Fort Worth, Texas 76155.  At all times pertinent to the Complaint, American was a common

carrier which operated a commercial airline transporting passengers from Terminal A of the Newark International Airport. American was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of all aircraft operating out of Terminal A at the Newark International Airport.

6.      Defendant Continental Airlines Inc. (hereinafter "Continental") is a Delaware corporation whose principal place of business is located at 1600 Smith Street, 3303D, Dept. HQSEO, Houston, Texas 77002. At all times pertinent to the Complaint, Continental was a common carrier which operated a commercial airline transporting passengers from Terminal A of the Newark International Airport. Continental was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of all aircraft operating out of Terminal A at the Newark International Airport.

7.      Defendant America West Airlines, Inc. (hereinafter "America West") is a Delaware corporation whose principal place of business is 111 West Rio Salado Parkway, Tempe, Arizona 85281. At all times pertinent to the Complaint, America West was a common carrier which operated a commercial airline transporting passengers from Terminal A of the Newark International Airport. America West was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of all aircraft operating out of Terminal A at the Newark International Airport.

8.      Defendant AirTran Airways, Inc. (hereinafter "AirTran") is a Delaware corporation whose principal place of business is 9955 AirTran Boulevard, Orlando, Florida 32827. At all times pertinent to the Complaint, AirTran was a common carrier which operated a commercial airline transporting passengers from Terminal A of the

Newark International Airport. AirTran was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of all aircraft operating out of Terminal A at the Newark International Airport.

9.     Defendant TEM Enterprises d/b/a Casino Express is a Nevada corporation whose principal place of business is 976 Mountain City Hwy., Elko, Nevada 89801. At all times pertinent to the Complaint, TEM Enterprises operated a common carrier known as Casino Express which was a commercial airline transporting passengers from Terminal A of the Newark International Airport. TEM Enterprises and Casino Express were jointly, severally, and contractually responsible through its agents and designees for maintaining the security of all aircraft operating out of Terminal A at the Newark International Airport.

10.     Defendant National Airlines, Inc. (hereinafter "National") is a Delaware corporation whose principal place of business is located at 6020 Spencer Street, Las Vegas, Nevada 89119-2934. At all times pertinent to the Complaint, National was a common carrier which operated a commercial airline transporting passengers from the Newark International Airport. National was jointly, severally, and contractually responsible through its agents, employees and contractors for maintaining the security of aircraft operating out of the Newark International Airport.

## Security Company Defendants

11.     Defendant Securicor PLC (hereinafter "Securicor") is a foreign corporation organized and existing under the laws of the United Kingdom. Securicor is the parent corporation of and exercised control over its wholly-owned subsidiary, Defendant Argenbright. Securicor, as the parent corporation of its wholly-owned

subsidiary Argenbright, is liable for the negligent, reckless and wanton acts of Argenbright.

12.    Defendant Argenbright Security, Inc. (hereinafter "Argenbright") is a Georgia corporation whose principal place of business is located at 3353 Peachtree Road NE, Suite 1120, Atlanta, Georgia 30326.    At all times pertinent to the Complaint, Argenbright was responsible for maintaining the security of each aircraft operating out of Terminal A at the Newark International Airport.

13.    Argenbright and Securicor (hereinafter "Security Company Defendants") were corporations engaged in the business of, and separately and collectively assumed responsibility for, implementing, developing, owning, operating, managing, maintaining and supervising airline and airport security for American for their flights departing from Newark International Airport, including Flight 93.

### Aircraft Defendant

14.    Defendant Boeing Co. (hereinafter "Boeing") is a Delaware corporation whose principal place of business is located at 7755 East Marginal Way South, Seattle, Washington 98108.    Boeing designed and manufactured the Boeing 757, tail number N591UA, which operated on September 11, 2001, as Flight 93.

### Airport Defendant

15.    Defendant Port Authority of New York and New Jersey (hereinafter "Airport Defendant") at all times pertinent, was and is a government entity duly organized and existing under the laws of New York and New Jersey and maintaining its principal place of business in New York and New Jersey.    On September 11, 2001, the Port Authority controlled, operated, managed and maintained Newark Airport under a lease with the city of Newark, New Jersey and was responsible for airline and airport

security for all flights departing from Newark Airport and shared responsibility for airport security at Newark Airport.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 408(b)(1)(3) of the Air Transportation Safety and Systems Stabilization Act ("ATSSSA"), Pub. L. No. 107-42, 115 Stat. 230242 (Sept, 22, 2001) (reprinted, as amended, at 49 U.S.C. § 40101 note (West 1993)). This Court also has jurisdiction under 28 U.S.C. § 1332, in that the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and there is diversity of citizenship between the parties. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 for all related claims. Finally, this Court also has personal jurisdiction over the Defendants herein.

17.     Venue is appropriate in this forum based on ATSSSA § 408(b)(1)(3).

## FACTUAL ALLEGATIONS

18.     Prior to September 11, 2001, regular meetings were held among the Airline Defendants, the Security Company Defendants, and the Airport Defendant during which airport security was discussed, and details about terrorist threats and potential security breaches were reviewed and discussed.

19.     Prior to September 11, 2001, the Defendants knew of the grave risk of attacks upon civil aviation generally, and commercial aircraft and airports.   The Department of Transportation Inspector General, Federal Aviation Administration, Government Accounting Office and other independent and industry auditors repeatedly published information concerning terrorist threats to civil aviation.  For example, in its 1999 annual report, *Criminal Acts Against Civil Aviation* (hereinafter "The 1999 Report"), the FAA's Office of Civil Aviation Security advised of potential dangers,

including the identification of Osama Bin Laden as a specific threat to hijack an airliner and target the United States:

> "Another threat to civil aviation is from Saudi terrorist financier Usama Bin Laden....In a May, 1998 interview, Bin Ladin implied that he could use a shoulder-fired surface-to-air missile to shoot down a military passenger aircraft transporting U.S. military personnel. He reiterated that his attacks would not distinguish between U.S. civilians and military personnel. Moreover, an exiled Islamic leader in the United Kingdom proclaimed in August 1998 that Bin Ladin would 'bring down an airliner, or hijack an airliner to humiliate the United States."

The 1999 Report at 59.

20.     The report also points to the 1994 Ramzi Yousef conspiracy to place explosive devices on as many as 12 U.S. airliners flying out of the Far East as further evidence of the desire and intent to attack U.S. commercial aircraft. *Id.*

21.     In addition, threats that aircraft would be used as missiles and crashed into American institutions were passed on to the FAA and American, the Other Airline Defendants, and other commercial carriers:

> In January 1995, a Philippine National Police raid turned up materials in a Manilla apartment indicating that three individuals – Ramzi Yousef, Abdul Murad and Khalid Shaykh Mohammed – planned, among other things, to crash an airplane into CIA headquarters....Information on the threat was passed to the FAA, which briefed U.S. and major foreign carriers.

Joint Inquiry Staff Statement, Part I, Eleanor Hill, Staff director, Joint Inquiry Staff, September 18, 2002, at p. 26.

In the 1999 Report, the FAA issued the following warning:

> "There is every reason to believe that civil aviation will continue to be an attractive target for terrorist groups...Increased awareness and vigilance are necessary to deter future incidents – be they from terrorists like Ramzi Yousef or non-terrorists bent on suicide, as occurred in Brazil in 1997. It is important to do the utmost to prevent such acts rather than to lower security measures by interpreting the statistics [which showed a decrease in incidents between 1993 and 1998] as an indication of a decreased threat."

The 1999 Report at p. 59-60.

22.    Prior to September 11, 2001, the Defendants knew or should have known about numerous documented and reported security breaches involving unauthorized access to secure areas (including ramps and aircraft) and warnings that security was at risk and that passenger and carry-on baggage screening system was vulnerable. Those reports detailed dangerous, long-standing flaws and deficiencies in airport security and warned the Defendants that their airline and airport security systems were unsafe and needed significant improvements in staffing, training and equipment in order to ensure the safety of persons traveling by air transportation against acts of criminal violence, hijacking and air piracy.

23.    On and prior to September 11, 2001, the Airline Defendants and the Airport Defendant knew or should have known evaluations of the airline and airport security systems revealed that the systems, as they existed on September 11, 2001, constituted a grave security risk; that the Security Company Defendants provided screening services which were inadequate and that such inadequacies posed severe dangers to its passengers and the public; that the Security Company Defendants failed to adequate train its employees, hired illegal aliens, failed to conduct required criminal background checks, and routinely failed in security evaluations.

24.    On September 11, 2001, between 6:30 and 7:00 a.m., John Talignani, a passenger, boarded Flight 93 at the Newark International Airport en route, non-stop, to San Francisco, California.

25.    A group of four terrorists also arrived at Newark International Airport early on the morning of September 11, 2001.  These young, Middle Eastern men,

carrying dangerous weapons, checked-in, passed through a security screening checkpoint at Terminal A, and perhaps elsewhere at Newark, and boarded United Flight 93.

26.     Upon information and belief, the four individuals who hijacked Flight 93 have been identified as Saeed Alghamdi, Ahmed Ibrahim A. Al Haznawi, Ahmed Alnami, and Ziad Samir Jarrah (collectively referred to as the "hijackers") and were associated with or members of the Al Qaeda terror network let by Osama Bin Laden.

27.     At 8:01 a.m., Flight 93 pushed away from Gate 17 at Newark International Airport.  Shortly after pushback, the captain informed the passengers that there would be a delay.

> ❖ 7:59 a.m. - American Airlines Flight 11, departing from Boston Logan International Airport to Los Angeles, disappeared from radar screens.
>
> ❖ 8:10 a.m. – American Airlines Flight 77 departed from Washington Dulles International Airport and disappeared from radar screens shortly after take off.
>
> ❖ 8:24 a.m. – United Flight 175 notified air traffic control that "we heard a suspicious transmission on our departure from BOS. Sounds like somebody keyed the mike and said everyone stay in your seats." Three minutes later, the flight disappeared from radar.
>
> ❖ 8:40 a.m. – The Federal Aviation Administration notified the Northeast Air Defense Sector of NORAD that American Airlines Flight 11 had been hijacked.

28.     At 8:42 a.m. Flight 93 departed from Newark International Airport.

> ❖ 8:43 a.m. – The Federal Aviation Administration notified the Northeast Air Defense Sector of NORAD that United Flight 175 had been hijacked.
>
> ❖ 8:45 a.m. – American Airlines Flight 11 was flown into the North Tower of the World Trade Center.

29.     By 9:02 a.m., Flight 93 reached its cruising altitude of 31,000 feet.

30.     Shortly after 9:00 a.m., United warned its aircraft to barricade its cockpit doors and beware of cockpit intrusions.

> ❖ 9:03 a.m. - United Flight 175 was flown into the South Tower of the World Trade Center.

31.     At roughly 9:20 a.m., the hijacking aboard Flight 93 began. Two of the terrorist hijackers stormed the cockpit of Flight 93. The air traffic control center in Cleveland, Ohio, recorded a voice on Flight 93, "Hey get out of here." Later, in a thick accent, the Cleveland air traffic control center heard "[t]here is a bomb on board. This is the captain speaking. Remain in your seat. There is a bomb on board. Stay quiet. We are meeting their demands. We are returning to the airport." The two other hijackers attempted to control the passengers, putting them in the rear of the plane.

> ❖ 9:24 a.m. - Federal Aviation Administration notified the Northeast Air Defense Sector of NORAD that American Airlines Flight 77 had been hijacked.

32.     9:58 a.m. – A group of passengers, possibly including John Talignani, stormed the cockpit and overtook the terrorists.

33.     10:06 a.m. – Due to the heroic efforts of the passengers to prevent the hijackers from using the subject aircraft as an instrument of mass destruction, the subject aircraft crashed in Somerset County, near Shanksville, Pennsylvania, killing all passengers and crew.

34.     As a result of the actions of the hijackers, the passengers of Flight 93 were subjected to unusual G-forces, causing physical personal injuries, as well as pre-death pain and suffering, extreme emotional distress, extreme terror, and unremitting fear of impending death based on the knowledge that the hijackers had killed or attempted to kill passengers or crew aboard Flight 93 and that other aircraft had been hijacked and crashed into the World Trade Center and Pentagon, and damage to their personal property.

35.    Prior to September 11, 2001, the Department of Transportation through its Federal Aviation Administration licensed United and the other Airline Defendants as commercial air carriers authorized to transport passengers for hire, pursuant to which United and the other Airline Defendants had an obligation to comply with all federal statutes, rules, regulations, and environmental directives to achieve the highest level of airline and airport security to ensure that passengers were protected from harm as a result of a terrorist action.

36.    On and prior to September 11, 2001, the Airline Defendants, the Security Company Defendants, and the Airport Defendant, through their agents, servants, officers, employees, designees and/or contractors jointly and severally undertook and were required to develop, implement, own, operate, manage, supervise, staff, equip, maintain, control and/or oversee the airline and airport security system at Newark International Airport (including, but not limited to passenger screening, security checkpoint operations, pre-boarding passenger and luggage inspections, controlling access to secure areas and other security activities, ticketing purchase and check-in procedures and passenger identification and document checks for the subject aircraft and flight), to ensure the safety of persons traveling in air transportation against acts of criminal violence and air piracy.

37.    Prior to September 11, 2001, the Airline Defendants and the Airport Defendant entered into contractual relationships with the Security Company Defendants to provide security screening services at Newark International Airport.

38.    On and prior to September 11, 2001, the Airline Defendants, the Security Company Defendants, and the Airport Defendant, by their respective officers, agents, employees, servants and/or representatives, separately and collectively, selected, hired, trained, instructed and supervised the security checkpoint screeners, metal detector and x-

ray machine monitors and others who operated, maintained and controlled the security checkpoints at Newark International Airport.

39.    At all times pertinent to this Complaint, Security Company Defendants owned, operated, controlled, and supervised the security screening system at Terminal A, through which each terrorist passed.

40.    On and prior to September 11, 2001, all Defendants, their agents, associates and partners, and each of them, were the agent, servant, employee, assignee, successor in interest or joint venturer of each other and were acting within the purpose or scope of such agency or employment; and all acts or omissions alleged herein of each defendant were authorized, adopted, approved, or ratified by each of the other Defendants.

41.    All Defendants, and each of them, were fully informed of the actions of their agents and employees, and no officer, director or managing agent of defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and then all defendants, and each of them, thereby ratified those actions.

42.    United is a common carrier which owned, operated, controlled and supervised Flight 93, including its security.

43.    The terrorists were permitted to board Flight 93 carrying dangerous and deadly weapons. The terrorists used these dangerous weapons and stormed the aircraft's cockpit doors to seize control and hijack Flight 93, thereby causing the events that led to the injury and death of John Talignani and all other passengers of Flight 93.

44.    As a direct and proximate consequence of the conduct of all Defendants, the Defendants are jointly and severally liable for damages sustained by each Plaintiff

and each Plaintiff is entitled to recover such damages to the extent allowed under applicable state law.

## COUNT ONE

### (Negligence of United)

45.    Plaintiffs incorporate by reference all prior allegations contained in this Complaint.

46.    On September 11, 2001, Defendant United was a common carrier which operated a Boeing 757 aircraft, tail number N591UA, as Flight 93, offering non-stop service between Newark International Airport and San Francisco International Airport.

47.    John Talignani was a passenger aboard Flight 93.

48.    At all times pertinent to this Complaint, United owned, operated, supervised and controlled Flight 93 through its agents, employees and contractors.

49.    At all times pertinent to this Complaint, it was the duty of United, by and through its agents, employees or designees, to exercise the highest degree of care for the safety and security of the passengers and crew aboard Flight 93, including the decedent, John Talignani.

50.    As a result of the foregoing, John Talignani suffered personal injuries, trauma, severe fright, fear of imminent death, disaster, terror, physical injuries and property damage that ultimately resulted in his untimely and tragic death.  Plaintiff brings a survival action on her behalf, as representative of his estate.

51.    Eileen Bertorelli-Zangrillo, and the heirs of the decedent have, as a result of the foregoing, each suffered, and will continue to suffer, extreme grief, sorrow, devastation, pain and suffering and mental and physical anguish; the loss of John Talignani'ss society, love and affection, support, consortium and companionship;

substantial economic damages including loss of support, loss of goods, and loss of future services; and have otherwise been damaged in a personal and pecuniary way.

## COUNT TWO

### (Negligence of Airline Defendants)

52.    Plaintiffs incorporate by reference all prior allegations contained in this Complaint.

53.    At all times relevant to this Complaint, each of the Airline Defendants were common carriers which operated commercial airlines transporting passengers from Terminal A of the Newark International Airport.

54.    Each of the Airline Defendants has an independent and non-delegable duty to maintain the security of its aircraft. The Airline Defendants subcontracted for security services for all flights departing from Terminal A of the Newark International Airport to Argenbright.

55.    The Airline Defendants each had a duty or voluntarily undertook a duty through its contract with Argenbright to exercise the highest degree of care for the safety and security of all passengers passing through security at Terminal A of the Newark International Airport.

56.    The Airline Defendants each knew or should have known that the security screening system they supervised, designed and controlled through Argenbright was grossly inadequate and posed a severe danger to its passengers and the flying public. The Airline Defendants knew or should have known that the security system was a "sieve" frequently unable to detect even the most obvious of dangerous weapons in numerous undercover evaluations.

57.     Each of the Airline Defendants knew or should have known that its security subcontractor, Argenbright, provided screening services which were grossly inadequate and that such inadequacies posed severe dangers to its passengers and the flying public, including John Talignani.  Each of the Airline Defendants knew or should have known that Argenbright (and others) failed to adequately train its employees, hired illegal aliens, failed to conduct required criminal background checks and routinely failed in undercover security evaluations.

58.     The Airline Defendants' failure to remedy these known security lapses was a reckless, negligent and willful and wanton breach of their respective duties of care to all passengers passing through Terminal A of the Newark International Airport, including John Talignani.

59.     As a direct and proximate result of the Airline Defendants' breach of their duty of care, Flight 93 was hijacked by four terrorists, thereby causing John Talignani's death.

60.     As a result of the foregoing, John Talignani suffered personal injuries, trauma, severe fright, fear of imminent death, disaster, terror, physical injuries and property damage that ultimately resulted in his tragic death.  Plaintiff brings a survival action on her behalf as representative of his estate.

61.     Eileen Bertorelli-Zangrillo and the heirs of the decedent, as a result of the foregoing, each have suffered and will continue to suffer extreme grief, sorrow, devastation, pain and suffering and mental and physical anguish; the loss of John Talignani's society, love and affection, support, consortium and companionship; substantial economic damages including loss of support, loss of goods, and loss of future services; and have otherwise been damaged in a personal and pecuniary way.

## COUNT THREE

### (Negligence of Security Company Defendants)

62.    Plaintiffs incorporate by reference all prior allegations contained in this Complaint.

63.    At all times relevant to this Complaint, Security Company Defendants owned, operated and controlled, through its employees and agents, the security system at Terminal A of Newark International Airport.

64.    Security Company Defendants owed John Talignani and all others passing through its security system at Terminal A of the Newark International Airport the highest duty of care in preventing passengers from carrying dangerous weapons through its security system.

65.    Security Company Defendants recklessly and negligently breached this duty of care, by failing to adequately train its employees, to correct known security lapses, and ultimately failing to prevent four terrorists from passing through its security system on September 11, 2001, while carrying dangerous weapons.

66.    At all times pertinent to this Complaint, Security Company Defendants knew or should have known that its security screening program was grossly inadequate in that it routinely failed to detect dangerous weapons in undercover investigations. Security Company Defendants knew or should have known that such inadequacies posed severe dangers to its passengers, crew and the flying public, including John Talignani.

67.    As a direct and proximate result of Security Company Defendants' breach of its duty of care, the four terrorists were permitted to board and hijack Flight 93, thereby causing the death of John Talignani and all other passengers and crew on Flight 93.

68.     As a result of the foregoing, John Talignani suffered personal injuries, trauma, severe fright, fear of imminent death, disaster, terror, physical injuries and property damage that ultimately resulted in his tragic death.  Plaintiff brings a survival action on her behalf as representative of his estate.

69.     Eileen Bertorelli-Zangrillo and the heirs of the decedent, as a result of the foregoing, each have suffered and will continue to suffer extreme grief, sorrow, devastation, pain and suffering and mental and physical anguish; the loss of John Talignani's society, love and affection, support, consortium and companionship; substantial economic damages including loss of support, loss of goods, and loss of future services; and have otherwise been damaged in a personal and pecuniary way.

## COUNT FOUR

### (Negligence of Airport Defendant)

70.     Plaintiffs incorporate by reference all prior allegations.

71.     At all times relevant to this Complaint, the Airport Defendant owned, operated and controlled, through its employees and agents, the security and passenger screening systems in place at Newark International Airport on September 11, 2001.

72.     Airport Defendant owed all passengers, crew members and the general public the highest duty of care in preventing passengers from carrying dangerous weapons through its security systems and services.

73.     Airport Defendant recklessly and negligently breached its duty of care by failing to adequately train its employees, hire qualified personnel, or correct known security lapses.  Airport Defendant ultimately failed to prevent young, male, Middle Eastern Islamic terrorists from passing through their security systems at Newark

International Airport on September 11, 2001, transporting dangerous, deadly, and prohibited weapons.

74.    At all times pertinent to this Complaint, Airport Defendant knew or should have known that security screening programs and personnel in place were grossly inadequate.  The Airport Defendant knew or should have known that these gross inadequacies posed severe foreseeable danger and risk to airline passengers, crew members and the general public, including John Talignani.

75.    As a direct and proximate result of Airport Defendant's breach of its duty of care, terrorists were permitted to board Flight 93, and to board, hijack and terrorize Flight 93, thereby causing the crash of the aircraft and the injuries and death of John Talignani.

76.    As a result of the foregoing, John Talignani suffered severe physical personal injury, emotional trauma, including fear of impending death and wrongful death, and his estate is entitled to damages in an amount to be determined at trial.

77.    The Plaintiffs have suffered and will continue to suffer mental anguish, grief and loss, loss of income and support, loss of services, companionship and care, and are entitled to damages.

## COUNT FIVE

### (Strict Liability of Boeing)

78.    Plaintiffs incorporate by reference all prior allegations contained in this Complaint.

79.    A usual and customary component of Defendant Boeing's business is the design and manufacture of commercial aircraft to be used to transport passengers.

80.    Defendant Boeing designed and manufactured the 757 aircraft, tail number N591UA, which operated on September 11, 2001, as Flight 93.

81.    The aforementioned aircraft was being used in an intended and foreseeable manner on the morning of September 11, 2001.

82.    Defendant Boeing defectively designed the door and accompanying locks to the cockpit of the 757 aircraft.  The design in use on September 11, 2001, in the aircraft in question, was unreasonably dangerous in that it could easily be penetrated by any determined passenger.  The cockpit doors were not secure and the accompanying locks were insufficient to deter or prevent a hijacking attack.  Alternative and safer designs were available for a nominal increase in cost which would have prevented these terrorists ability to access the cockpit on Flight 93.

83.    This defective design permitted the terrorists to gain access to the cockpit of Flight 93 and hijack the aircraft.  Boeing's defective design was a proximate cause of the death of John Talignani and the other passengers on Flight 93.

84.    As a result of the foregoing, John Talignani suffered personal injuries, trauma, severe fright, fear of imminent death, disaster, terror, physical injuries and property damage that ultimately resulted in his tragic death.  Plaintiff brings a survival action on her behalf as representative of his estate.

85.    Eileen Bertorelli-Zangrillo and the heirs of the decedent, as a result of the foregoing, each have suffered and will continue to suffer extreme grief, sorrow, devastation, pain and suffering and mental and physical anguish; the loss of John Talignani's society, love and affection, support, consortium and companionship; substantial economic damages including loss of support, loss of goods, and loss of future services; and have otherwise been damaged in a personal and pecuniary way.

## COUNT SIX

### (Negligent Design of Boeing)

86.    Plaintiffs incorporate by reference all prior allegations contained in this Complaint.

87.    Defendant Boeing designed and manufactured the 757 aircraft, tail number N591UA, operated on September 11, 2001, as Flight 93.

88.    Defendant Boeing owed all passengers who fly on their aircraft, and those who flew on Flight 93, including John Talignani, a duty of care in safely designing the aircraft including secure cockpit doors and accompanying locks.

89.    Defendant Boeing recklessly and negligently breached this duty of care by failing to design the cockpit doors and accompanying locks to the 757 aircraft in question in a manner which would prevent hijackers and/or other passengers from accessing the cockpit. The cockpit doors on Flight 93 were not secure and the accompanying locks were insufficient to deter or prevent a hijacking attack.

90.    Defendant Boeing knew or should have known that the design of its cockpit doors was defective. Defendant Boeing failed to remedy this defect. Defendant Boeing knew or should have known that alternative and safer designs were available for a nominal increase in cost which would have prevented these terrorists ability to access the cockpit on Flight 93.

91.    This defective design permitted the terrorists to easily gain access to the Flight 93 cockpit on September 11, 2001, and was a proximate cause of the death of John Talignani and the aircraft's other passengers.

92.    As a result of the foregoing, John Talignani suffered personal injuries, trauma, severe fright, fear of imminent death, disaster, terror, physical injuries and

property damage that ultimately resulted in his tragic death. Plaintiff brings a survival action on her behalf as representative of his estate.

93.    Eileen Bertorelli-Zangrillo and the heirs of the decedent, as a result of the foregoing, each have suffered and will continue to suffer extreme grief, sorrow, devastation, pain and suffering and mental and physical anguish; the loss of John Talignani's society, love and affection, support, consortium and companionship; substantial economic damages including loss of support, loss of goods, and loss of future services; and have otherwise been damaged in a personal and pecuniary way.

### COUNT SEVEN

### (Breach of Warranty by Boeing)

94.    Plaintiffs incorporate by reference all prior allegations.

95.    A usual and customary component of Defendant Boeing's business is the design and manufacture of commercial aircraft to be used by common carriers to transport passengers.

96.    Defendant Boeing designed, manufactured and placed into the stream of commerce the 757 aircraft, tail number N591UA, which operated on September 11, 2001, as Flight 93.

97.    In placing the aforementioned aircraft into the stream of commerce, Boeing warranted that the aircraft was reasonably safe for its intended use as a commercial aircraft to be used for transporting passengers.

98.    The aforementioned aircraft was being used in an intended and foreseeable manner on the morning of September 11, 2001.

99.    Defendant Boeing defectively designed the door and accompanying locks to the cockpit of the 757 aircraft. The design in use on September 11, 2001, of the

aircraft in question, was unreasonably dangerous in that it could easily be penetrated by any determined passenger. The cockpit doors were not secure and the accompanying locks were insufficient to deter or prevent a hijacking attack. Alternative and safer designs were available for a nominal increase in cost which would have prevented the ability to access the cockpit of Flight 93.

100.    This defective design permitted ready access to the cockpit. Boeing's defective design and failure to design and provide secure cockpit doors was a proximate cause of the injuries and death of the Plaintiff.

101.    Because of the defective design of the cockpit door, the 757 aircraft, tail number N591UA was not reasonably safe for its intended use as a commercial passenger aircraft when it was placed by Boeing in the stream of commerce. Boeing breached its warranty by placing into the stream of commerce an aircraft that was not reasonably safe for its intended use.

102.    Because ground victims are foreseeable victims of airplane crashes, Plaintiffs were among those whom Boeing might reasonably have expected to be affected by the plane.

103.    As a result of the foregoing, Plaintiffs suffered severe physical personal injury, emotional trauma, including fear of impending death, death, loss of future income and support, loss of services and consortium, and are entitled to damages in an amount to be determined at trial.

## COUNT EIGHT

### (Wrongful Death)

104.    Plaintiffs incorporate by reference all prior allegations contained in this Complaint.

105.    Plaintiff brings this action for the wrongful death of John Talignani proximately caused by the Defendants' negligence and strict liability.

106.    Plaintiffs are entitled to recover monetary damages from Defendants for the wrongful death of John Talignani.  Plaintiffs are entitled to recover full damages incurred, as fair and just compensation for the injuries, resulting from this wrongful death.

107.    The injuries and damages suffered by the Plaintiffs were proximately caused by the negligence of the Defendants.

108.    As a direct and proximate result of the wrongful death of the decedent, his heirs have suffered and will continue to suffer financially, having been deprived of all future aid, income, assistance, wages, support, services, comfort, companionship, affection and financial support.

109.    As a direct and proximate result of the Defendants' negligence resulting in the wrongful death of decedent, the Plaintiffs suffered and will continue to suffer, permanent physical, mental and emotional distress, trauma, and lasting physical, emotional, and psychological injuries.

110.    As a further result of acts of the Defendants, the Plaintiffs have incurred actual damages including but not limited to out of pocket expenses, and other expenses and losses for which they are entitled to full and fair recovery.

## COUNT NINE

### (Survival)

111.    Plaintiffs incorporate by reference all prior allegations contained in this Complaint.

112.    As a result of the reckless, grossly negligent and/or negligent acts of Defendants as described herein, John Talignani was placed in a severe, prolonged, extreme, and traumatic apprehension of harmful, offensive unwarranted bodily contact, injury and assault.  John Talignani suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of impending death and related physical and emotional trauma and pain.

113.    John Talignani was mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to his personal physical injury and death.

114.    As a result of Defendants' negligent conduct, John Talignani endured pain and suffering, severe trauma, fear, anxiety, physical mental and emotional distress and anguish and other items of damages to be shown at trial.

115.    Eileen Bertorelli-Zangrillo and the heirs of the decedent have, as a result of the foregoing, each suffered and will continue to suffer extreme grief, sorrow, devastation, pain and suffering and mental and physical anguish; the loss of John Talignani's society, love and affection, support, consortium and companionship; substantial economic damages including loss of support, loss of goods, and loss of future services; and have otherwise been damaged in a personal and pecuniary way.

## COUNT TEN

### (Claim for Wrongful Death and Survival Damages Based on Res Ipsa Loquitur)

116.    Plaintiffs incorporate by reference all prior allegations.

117.    Defendants had exclusive management and control of the aircraft and airport security systems, through with the terrorists penetrated, and whose actions resulted in damages to and death of John Talignani.

25

118.    The penetration of the aviation security systems and John Talignani's death as set forth herein, are such that would not have occurred had the Defendants exercised reasonable and ordinary care in the maintenance and operation of basic security.

119.    Because of the Defendants' exclusive control and management of aviation security, Defendants are possessed of superior, if not exclusive, access to information concerning the precise cause of the hijackings. The Defendants were in the position to prevent hijackings, knew full well the risk of hijackings, and failed to act to prevent them.

120.    The penetration of the aviation security system was not due to any action or contribution on the part of John Talignani.

121.    As a result of the foregoing, John Talignani suffered severe physical personal injury, emotional trauma, including fear of impending death and wrongful death, and his heirs are entitled to damages in an amount to be determined at trial.

122.    The Plaintiffs have suffered and will continue to suffer mental anguish, grief and loss, loss of income and support, loss of services, companionship and care, and are entitled to damages.

### COUNT ELEVEN

### (Negligent Infliction of Emotional Distress)

123.    Plaintiffs incorporate by reference all prior allegations contained in this Complaint.

124.    Defendants knew or should have known that their conduct and actions would lead to increased danger, risk of injury, and resulting emotional distress to the Plaintiff.

125.    The Defendants knew or should have known that the failure to implement adequate safety and security measures would place the public in danger and under emotional distress.

126.    The actions of Defendants were in negligent disregard for the rights and lives of those killed, those injured, and their surviving loved ones.

127.    The acts and conduct of Defendants were undertaken in a negligent manner.  The course of conduct of the aviation industry was such that it was reasonably foreseeable to result in the death, injury and suffering of innocent people.  The repeated failure to implement adequate security culminated in the death and injury of innocent people on September 11, 2001, including John Talignani, causing continuing, permanent emotional, mental and physical suffering to the decedent and to the Plaintiffs.

128.    As a direct and proximate cause of Defendants' negligent, grossly negligent and/or reckless misconduct and disregard for safety in breach of their duty, Plaintiffs have suffered severe emotional distress and psychiatric injury.

129.    Defendants, by reason of their negligence and recklessness, inflicted emotional distress upon the Plaintiffs.

130.    Eileen Bertorelli-Zangrillo and the heirs of the decedent have, as a result of the foregoing, each suffered and will continue to suffer extreme grief, sorrow, devastation, pain and suffering and mental and physical anguish; the loss of John Talignani's society, love and affection, support, consortium and companionship; substantial economic damages including loss of support, loss of goods, and loss of future services; and have otherwise been damaged in a personal and pecuniary way.

**JURY DEMAND**

131.    Plaintiffs demand a trial by jury of all issues that are so triable.

**REQUEST FOR RELIEF**

WHEREFORE, having complained of the conduct of the Defendants, the Plaintiffs pray for relief commensurate with the causes of action set forth herein, including but not limited to, an award of actual damages in an amount determined by the trier of fact to be sufficient to compensate fully for all losses suffered by the Plaintiffs, pain and suffering, loss of consortium, services and companionship, an award of punitive damages, in an amount determined to be sufficient to hold the defendants accountable for their part in this tragedy, to express the seriousness of their conduct, and to deter such similar conduct in the future, reasonable attorney's fees, the costs of this action, and such additional relief as this court deems just and proper.

**HANLY & CONROY LLP**

By:_____
　　　　Paul J. Hanly, Jr., Esquire (PH-5486)
　　　　Jayne Conroy, Esquire (JC-8611)
　　　　415 Madison Avenue
　　　　New York, NY 10017-1111
　　　　Telephone: (212) 401-7600

　　　　　　　　and

**MOTLEY RICE LLC**

By:_____
　　　　Michael E. Elsner, Esquire (ME-8337)
　　　　Ronald L. Motley, Esquire
　　　　Don Migliori, Esquire
　　　　Jodi Westbrook Flowers, Esquire
　　　　Mary Schiavo, Esquire
　　　　Jeff Thompson, Esqire
　　　　Robert T. Haefele, Esquire
　　　　Justin B. Kaplan, Esquire
　　　　28 Bridgeside Boulevard
　　　　Post Office Box 1792
　　　　Mount Pleasant, SC 29465
　　　　Telephone:  (843) 216-9000

January 14, 2004.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                :       **ORDER DENYING**
                                                :       **DISCOVERY REQUESTS**
IN RE SEPTEMBER 11 LITIGATION                   :
                                                :       21 MC 97 (AKH)
                                                :       21 MC 101 (AKH)
-------------------------------------------------------x

ALVIN K. HELLERSTEIN, U.S.D.J.:

   Plaintiffs in the above captioned actions request additional discovery

relating to alleged improprieties on the part of the Transportation Security Administration

("TSA") and certain of the defense lawyers in the instant litigation. Specifically,

Plaintiffs assert that documents recently made available in the matter of U.S. v.

Moussaoui, currently pending before Judge Leonie Brinkema in the Eastern District of

Virginia, indicate an improper relationship between the TSA and defense counsel.

Plaintiffs request a conference to address these concerns and further request permission to

take depositions of various government officials. For the reasons stated below, Plaintiffs'

request is denied.

   By their letters, Plaintiffs assert that the communications between the TSA

and certain of the defense lawyers in the instant litigation indicate that the TSA may not

have acted with impartiality in reaching its determinations as to matters affecting both the

In re September 11 Litigation and the Moussaoui death penalty trial currently pending

before Judge Brinkema. To the extent any alleged improprieties by the TSA and defense

counsel concern the case currently before Judge Brinkema, such concerns are beyond the

scope of my jurisdiction. To the extent any alleged improprieties raise questions as to the

validity of the Final Order issued by the TSA on February 7, 2006 in In re September 11

Litigation, such concerns should properly be brought to the Second Circuit Court of

Appeals which holds exclusive jurisdiction over appeals from final orders by the TSA. See 49 U.S.C. § 46110.

In accordance with the foregoing, the request by Plaintiffs is denied, as not properly within the scope of cases and controversies over which I preside. Accordingly, and by separate enclosures, I am returning to their sender all letters submitted by counsel on this subject. Any requests by the media or members of the public for access to the letters referenced in this Order should be directed to Judge Brinkema.

SO ORDERED.

Dated:      New York, New York
            March 17, 2006

ALVIN K. HELLERSTEIN
United States District Judge

2